[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1023 
Harvey Lee Windsor was convicted of capital murder under § 13A-5-40(a)(2), Ala. Code 1975, and was sentenced to death by electrocution. Windsor appealed the conviction and sentence to the Court of Criminal Appeals. That court reversed the conviction and remanded for a new trial, holding that the prosecutor had improperly referred to Windsor's failure to testify at trial and holding that the circuit clerk's practice of excusing potential jurors to whom jury service would prove burdensome constituted reversible error. 683 So.2d 1013. We granted certiorari review. We reverse the judgment of the Court of Criminal Appeals and remand the case to that court for action consistent with this opinion.
 I
During closing argument, the following exchange occurred:
 "[Prosecution]: An intentional act — [the Judge] will tell you a person acts intentionally if his purpose is to cause that result or to engage in that conduct. That intent, whether Mr. Harvey Lee Windsor pulled the trigger of that sawed-off shotgun or whether [Colon] Lavon Guthrie did it, is still there. The intent to kill. Intent is a state of mind — something that is rarely capable of positive proof. I expect the Judge will tell you that. If we could get into that mind over there and put out here what is in there, we would have no reason for a jury.
 "[Defense counsel]: Object, that is improper argument.
"[The Court]: Overruled.
 "[Prosecution]: I'll tell you that he did have the intent to kill. If you find the intent to kill, there can be but one verdict. The state of mind — not capable of positive proof. How can you decide what his intent was? We have to prove — to find him guilty of capital murder — the intent. Intent can be inferred from his actions. Judge Austin will tell you in his charge that the intent can be inferred from his actions. Let's look at his actions. What did he do? How do we decide his intent? What are his actions?"
As this Court recently held in Ex parte Musgrove,638 So.2d 1360 (Ala. 1993), "When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument[s] made to the jury. . . ." 638 So.2d at 1368 (citingWashington v. State, 259 Ala. 104, 65 So.2d 704 (1953);Stephens v. State, 580 So.2d 11 (Ala.Crim.App. 1990), aff'd,580 So.2d 26 (Ala. 1991), cert. denied, 502 U.S. 859,112 S.Ct. 176, 116 L.Ed.2d 138 (1991)). In this case, the prosecutor was explaining the difference between felony murder and capital murder, and arguing that the State had proven Windsor guilty of capital murder. In order to do so, the State had to prove Windsor's intent to kill.
In this narrow context, it is apparent that the prosecutor was referring not to Windsor's failure to testify, but rather to the State's own failure to produce direct evidence of Windsor's intent. The only way for the State to prove intent, and, therefore, to obtain a conviction on the capital murder charge, was to show that Windsor acted in accordance with an intent to kill. In a certain sense, what the prosecutor said was *Page 1024 
true. To mangle the maxim, it could be said that were we able to peer into the hearts of men, there would be no question of fact to be resolved by the jury concerning the specific issue of the defendant's state of mind at the time of the offense. However, resolution of that specific issue is certainly not the full extent of the jury's function, and even indirect comments on an accused's failure to testify have the potential to be highly prejudicial to the defense. Musgrove, supra.
Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution. § 12-21-220, Ala. Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege.Musgrove, supra. To improperly comment on that privilege would be a clear violation of the defendant's rights under Article I, § 6, Ala. Const. 1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the Fourteenth Amendment to the United States Constitution.
In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
 " '[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.' Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984)."
 We cannot say that the statement made in this case was intended to be a remark on Windsor's failure to testify; nor can we conclude that the natural and necessary reaction of the jury would be to conclude that the prosecutor was referring to Windsor's failure to take the stand in his own defense. We hold that the trial court properly overruled the objection to the prosecutor's statement.
 II
The State's next argument for reversal is that the Court of Criminal Appeals erred in holding that any violation of §§12-16-74 and -145, Ala. Code 1975, always constitutes reversible error. That court reasoned that "a violation of those statutes impinges the integrity of the jury selection process." 683 So.2d at 1016. In other words, that court held that only a literal application of those statutes adopting a jury selection process would protect a defendant's right to a fair trial. We disagree. Section 12-16-80 states: "No objection can be taken to any venire of jurors except for fraud in drawing or summoning the jurors." No such fraud has been alleged or shown in this case.
 "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
§ 12-16-55. There is no evidence that this purpose has been frustrated so as to prejudice the defendant in this case. In order to understand Windsor's claim, it is necessary to examine the jury selection process itself.
There are two alternative plans and procedures for qualifying, selecting, drawing, summoning, and empaneling juries in Alabama, but each is essentially made up of four distinct stages. Stage one: The jury commission for each county compiles and maintains a master list of all persons in the county who may be called for jury duty. §§ 12-16-57 and12-16-145. This list may be drawn up from various sources described in § 12-16-57, but must include persons "whose listing will foster the policy and protect the rights provided in sections 12-16-55 and 12-16-56." §§ 12-16-57 and 12-16-145.
Stage two: Under the first plan, the "jury box" plan, names are drawn from the master list, and the jury commission determines whether the persons drawn are qualified to serve as jurors. §§ 12-16-58 through -60. A potential juror wishing to challenge a determination *Page 1025 
of disqualification may appear before "the court" within 10 days and demand a review of the commission's decision. §12-16-60. "The court" will determine if those prospective jurors whom the commission has qualified, and who appear on the designated day, are qualified to serve. § 12-16-74. Under the alternative plan, there are likewise two opportunities to pass upon the qualifications of the potential jurors. Before the day on which they are summoned to appear, the presiding circuit judge, or court officials (e.g., other judges, the clerk of the court, or others in the clerk's office) properly designated by the presiding judge, can disqualify persons for the reasons given in § 12-16-60. If they have not been previously disqualified or excused, and appear on the appointed day, a circuit judge will examine them and determine if they are qualified to serve under § 12-16-60. § 12-16-145. So far, the question the procedure is designed to answer is, "Does the State want this person to serve on a jury?"
Stage three: The next step in the process is designed to determine if the prospective jurors are able to serve on the jury or whether they should be excused. Although "[n]o qualified prospective juror is exempt from jury service," §12-16-62, a juror is allowed to plead certain excuses. See §12-16-63. Under the jury box plan, "the court" may entertain excuses from prospective jurors before or on the day set for appearance, but may require them to serve at some time in the future. §§ 12-16-63 and 12-16-74. Under the alternative plan, the presiding circuit judge or a properly designated court official may, before the date set for appearance, excuse a juror or postpone that juror's service to a future date. When they appear before a circuit judge, those jurors not previously excused may request that their service be excused or postponed. § 12-16-145. Despite the fact that jury service provides perhaps the only opportunity many citizens will have to observe the judicial process firsthand, the reality is that many would rather decline the honor. Thus, the question at stage three is often, "Does this person wish to serve on a jury?"
Stage four: The parties in the case are allowed to strike a jury by challenging certain persons for cause, or certain others peremptorily, subject, of course, to the restrictions ofBatson and its progeny. See, Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The question raised in Stage four is, "Do the parties want this person to serve on the jury that will decide their case?" Batson and its progeny are inapplicable to the question before us, because they deal solely with stage four of the process.
Windsor's challenge seems to involve a Sixth Amendment fair-cross-section argument, but does not truly rise to the level of a constitutional challenge to the array.[1] Instead, he argues that the practice in St. Clair County of excusing jurors by telephone was arbitrary and unlawful and resulted in a "tainted venire." According to the defendant, certain classes of jurors were underrepresented as a result of what he contends was the unauthorized acceptance of excuses by personnel in the clerk's office.[2]
Exactly which jurors were excused for what reasons is not clear from the record. Apparently, about 30 prospective jurors telephoned the clerk's office before the day they were to appear, and were excused either by the clerk herself, one of her assistant clerks, or, in some cases, a judge. According to the clerk, those excused were "students [who] were taking exams and people who were on vacations and elderly people and physically impaired people." None of these reasons would be inappropriate if a juror presented it to the judge after appearing for jury duty. In fact, nothing in the statutes suggests that *Page 1026 
excusing potential jurors by telephone is in any way improper, at least if done by a person properly designated and authorized to excuse. See, §§ 12-16-63 and 12-16-145.
This Court has stated that "it is the duty of the court to hear all the excuses and himself pass upon the same."Taylor v. State, 249 Ala. 130, 136, 30 So.2d 256, 260 (1947) (citing Title 30, § 38, Code of 1940). However, that statement was made long before the Legislature enacted § 12-16-145, Ala. Code 1975 (Ala. Acts 1981, No. 81-788, p. 1381, § 6), which specifically provides that the presiding circuit judge may delegate to other court officials the judge's authority to excuse jurors. Clearly, the intent was to ensure that the judge would not be overburdened with calls and letters from students worried about exams, travelers holding non-refundable tickets to exotic destinations, or others allowed to seek disqualification or an excuse or postponement by virtue of age, disability, or other reason. "Furthermore, in considering the qualifications of jurors, jury commissioners, [judges, and other properly designated officials] have the right [to], and should, consider the practical availability of prospective jurors." Kittle v. State, 362 So.2d 1260, 1264 (Ala.Crim.App. 1977), rev'd on other grounds, 362 So.2d 1269 (Ala. 1978). We hold that such a delegation of authority would therefore be proper under either plan of jury selection. We note that had there been a proper delegation of authority and designation of the officials empowered to hear the excuses in this case, and some catalog of acceptable excuses to guide those so empowered, the State could have avoided this problem entirely.
The only suggestion of impropriety is found in the following exchange between defense counsel and the clerk at the hearing regarding the unauthorized excuses:
 "Q: Could it have been for purely arbitrary reasons that some of these people were deleted from this list?
"A: What do you mean?
 "Q: If someone called that was a friend and they called someone in this courthouse to be let off. That could have happened on this list, could it not?
"A: I suppose.
 "Q: What I'm saying, the process is sometimes subject to abuse, is that not correct?
"A: I don't think we abuse it."
This is nothing like the proof of fraud required by §12-16-80 Ala. Code 1975, even though the word "fraud," as used in the statute, is "a relative term which 'includes all acts and omissions which involve a breach of legal duty injurious to others' " and even though "a legal fraud is all that is required by the statute for a venire to be quashed." Kittle v.State, 362 So.2d 1271, 1273 (Ala. 1978) (citation omitted). "There is a presumption that no legal fraud exists in the system used for the selection of jurors, in the absence of proof to the contrary, or an offer of such proof." Nixon v.State, 291 Ala. 657, 659, 286 So.2d 315, 317 (1973).
 "The initial burden of showing the State's purposeful or deliberate exclusion of any identifiable group from participation as jurors rests with the appellant. In the absence of a showing of purposeful systematic exclusion, no reversal is required. . . ." Williams v. State, 375 So.2d 1257, 1266 (Ala.Crim.App. 1979), cert. denied, 375 So.2d 1271 (Ala. 1979) (citations omitted). Windsor has shown nothing to indicate any purposeful and systematic exclusion of any identifiable class of potential jurors, nor has he shown that he suffered any harm as a result of such an alleged exclusion. Although there may be some slight discrepancy between the percentages of certain classes of persons living in St. Clair County and the percentages of those same classes as represented on the venire from which Windsor's jury was chosen, no statistical analysis would reveal the invidious discrimination already prohibited by Alabama law. § 12-16-56, Ala. Code 1975.
 "The purpose of [§ 12-16-80] is to accomplish the salutary purpose of preventing the quashing of venires for mere irregularities and to obviate the resulting delays in the administration of justice. The 'irregularities' spoken of refer to trivial administrative errors. They do not refer to such radical departures from the statutory *Page 1027 
scheme as to constitute a usurpation of legislative authority."
Kittle v. State, 362 So.2d at 1273.
The "irregularity" asserted here is the practice of the St. Clair County circuit clerk's office of granting what would be perfectly legitimate excuses to prospective jurors without the benefit of a formal delegation of power and a proper designation by the presiding judge. We conclude that the actions of the clerk, her staff, and possibly a judge or two, were not a usurpation of authority, but, instead, were the natural result of an attempt to conform to the spirit, if not the letter, of the statutes.
For the foregoing reasons, we reverse the judgment of the Court of Criminal Appeals and remand the case for action consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, STEAGALL, KENNEDY, INGRAM, and COOK, JJ., concur.
[1] We note for the record that Windsor is a white male. However, a Sixth Amendment fair-cross-section argument should not depend upon the identity of the defendant, but rather on the character of the community in which he resides.
[2] We note also that although the fair-cross-section argument is inapplicable to petit juries, the jury that convicted Windsor was 50% female and 16% African-American, even though, according to defense counsel, the population of St. Clair County is only 10% African-American. See, Duren v. Missouri, 439 U.S. 357,99 S.Ct. 664, 58 L.Ed.2d 579 (1979).